**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

----------------------------------------------------------- X

ASHLEY PULLEN,                          :
                                        :
                    Plaintiff,          :      Civil Action No.: 19-cv-18531
                                        :
        v.                              :      **AMENDED COMPLAINT**
                                        :
BRAMSHILL INVESTMENTS, LLC; ART         :      **Jury Trial Demanded**
DEGAETANO, in his individual and professional :
capacities; and STEPHEN SELVER, in his  :
individual and professional capacities, :
                                        :
                    Defendants.         :
----------------------------------------------------------- X

Plaintiff Ashley Pullen ("Plaintiff"), by and through her undersigned counsel, Wigdor

LLP, as and for her Amended Complaint in this action against Defendant Bramshill Investments,

LLC ("Bramshill" or the "Firm"), Art DeGaetano and Stephen Selver (together "Defendants"),

hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      One of the most important lessons learned from the #MeToo movement is that

while women have been subjected to unequal treatment, lower pay for equal work, sexual

harassment and gender discrimination, they are often fearful to make complaints about this

unlawful conduct.

2.      It is now well established that women are far less likely to come forward and take

a stand against discriminatory conduct for fear of reprisals such as being terminated from

employment positions, being victim-shamed and otherwise being attacked.

3.      When men in positions of power send the message to women that they will be

punished for exposing or complaining about unlawful discriminatory conduct, women are forced

to suffer in silence.  It is precisely because of this that so many inherently insidious and evil acts of sexual harassment and assault, as well as gender discrimination and other unlawful conduct in the workplace, have never been exposed to the light of day.

4.      We, as a society, should, and must, demand that women who speak out against discrimination are taken seriously and respected, not fired or otherwise threatened for taking a stand.  If we fail in this, a rampant culture of sexual harassment and discrimination will continue unabated.  Mothers, wives and daughters will suffer at the hands of men who fail to view them as co-equal productive members of the workforce.

5.      Unfortunately, Defendants Bramshill, its Chief Investment Officer and Co-Founder, Art DeGaetano, and its Chief Executive Officer, Stephen Selver, have apparently learned nothing from the #MeToo movement.  Specifically, during her employment with Bramshill – a firm that employs only four women – Ms. Pullen was subjected to blatant acts of gender discrimination, including, *inter alia*, less pay for equal work.

6.      When Ms. Pullen complained about the discriminatory treatment to which she was subjected, she was not taken seriously nor was she treated with respect.  Instead, she was at first chastised for "causing tension" and being "aggressive," which is a sexist term regularly used to put down and belittle women.  Case in point, in an opinion written in the case of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), Justice William J. Brennan, Jr. wrote:

> An employer who objects to aggressiveness in women but whose positions require this trait puts women in an intolerable and impermissible Catch 22: out of a job if they behave aggressively and out of a job if they do not.  [The anti-discrimination laws] lift[] women out of this bind.

7.      When Ms. Pullen continued to complain, she was abruptly terminated in retaliation for her complaints.  Indeed, Ms. Pullen was terminated only one week after making an explicit complaint about the "boys' club" environment fostered by the Firm.

8.      The reason provided for Ms. Pullen's termination – that she had emailed business-related documents to her personal email – is an obvious pretext for discriminatory and retaliatory animus.

9.      To begin, Bramshill had no rule prohibiting employees from forwarding business-related documents to their personal email accounts to facilitate the employee working remotely. In fact, Bramshill even allowed employees to send substantive business related emails – as opposed to the mere forwarding of a document for the employee's Bramshill related use – from personal email accounts as long as the emails were not retained on a public email server such as Google or Yahoo, which Ms. Pullen's email was not.  However, Bramshill even maintained an exception to this rule allowing for the use of public email services as long as the employee's Bramshill email address was copied.

10.      More to the point, during Ms. Pullen's short tenure at the Firm, numerous Bramshill male employees – including, but not limited to, Chief Operating Officer Kevin Jester, Chief Compliance Officer Bill Nieporte, Senior Portfolio Manager Mike Hirshfield, Executive Director Joshua Bubbs, Executive Director John Wasilewski and Operations Associate Roderick Jones –*sent over 30 emails to Plaintiff's personal email without repercussion or further investigation.*  It is inconceivable that the Firm terminated Ms. Pullen for sending emails to her personal email when the Firm's male employees, including its own CCO, sent business-related emails of a higher level of confidentiality to Ms. Pullen's personal email.

11. Unfortunately, Bramshill's unlawful retaliatory conduct did not end with Ms. Pullen's termination.

12. On September 18, 2019, shortly after Ms. Pullen (through counsel) put Bramshill on notice of her decision to pursue claims of gender discrimination and retaliation, ***Bramshill threatened to sue her in a transparent attempt to silence Ms. Pullen and prevent her from seeking to vindicate her rights under the anti-harassment and discrimination laws***. Specifically, Matthew P. Gallo, Esq., an attorney at Gordon Rees Scully Mansukhani, LLP ("Gordon & Rees"), counsel for Bramshill, emailed, *inter alia*, the following to counsel for Ms. Pullen:

> Presently, we are aware that your client downloaded and stole confidential and proprietary information and documents from Bramshill. More specifically, wrongful converted numerous proprietary contact list containing names, addresses, and telephone numbers; client list containing investors and their investments; marketing materials; among other confidential Bramshill property. These are very serious allegations ***that could (and will) warrant counterclaims*** under the New Jersey Computer Related Offenses Act, and other common law claims. ***If your client proceeds with filing a Complaint, Bramshill has authorized my firm to defend the claims, and file counterclaims concerning your client's wrongdoing.***

(Emphasis added).

13. Bramshill's threat, communicated by Mr. Gallo, was clearly an act of further retaliation.

14. First, the threat was made despite the fact that, as explained above, Ms. Pullen engaged in no wrongdoing whatsoever. Indeed, the Firm's own CCO emailed business-related items to Ms. Pullen's personal account and has not been terminated or threatened with litigation.

15.     Second, the prospect of litigation against Ms. Pullen was never raised while she was employed at the Firm or even shortly thereafter. ***Bramshill only threatened to sue Ms. Pullen after she retained counsel and put the Firm on notice that she intended to pursue claims under the anti-discrimination laws.***

16.     Finally, the retaliation did not end on September 18, 2019.  On September 19, 2019 and September 20, 2019, Gordon & Rees sent ***not one, but two*** separate harassing letters demanding that, among other ridiculous and baseless requests, "Ms. Pullen acknowledge and agree to ***turn over her personal laptop to an independent forensic expert (to be identified by Bramshill)*** to inspect and examine her computer databases and hard drives, cloud storage accounts, electronic files and accounts, and other metadata."

17.     In addition to constituting unlawful retaliation, Gordon & Rees's sudden repeated and menacing demands and letters threatening to assert counterclaims against Plaintiff illustrate the true motive behind Bramshill's pretextual explanation for terminating Ms. Pullen—to intimidate and harass a legitimate victim of discrimination.

18.     On the morning of September 24, 2019, Ms. Pullen filed this lawsuit against Defendants as is her legal right.  Then, true to their word, in the afternoon of September 24, 2019, Gordon & Rees, on behalf of Defendant Bramshill, filed a retaliatory complaint alleging six spurious causes of action against Ms. Pullen, as well as a motion for a temporary restraining order and preliminary injunction, in the District of New Jersey.

19.     This is precisely the sort of conduct that sends the message to women that they will be punished for raising concerns about harassment and discrimination.  It is precisely the reason that so many women continue to suffer in silence, and it is something that must come to an end.

20.     Given that Ms. Pullen had already filed the original complaint in this action – which clearly laid out the frivolous nature of any potential lawsuit against Ms. Pullen – when Gordon & Rees filed retaliatory claims against her, it is even more apparent that Defendant Bramshill's true purpose behind its lawsuit was to send the message to Ms. Pullen and other victims of gender discrimination that *this* is what happens to women who speak up: **they get punished, silenced and sued.**[1]

21.     Accordingly, Plaintiff files this Complaint seeking redress for the discriminatory and retaliatory conduct committed by Defendants in violation of the Equal Pay Act, 29 U.S.C. §§ 206 *et seq.* (the "EPA"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, New York Executive Law §§ 290 *et seq.* (the "NYSHRL"), the New York City Human Rights Law, N.Y.C. Administrative Code §§ 8-107 *et seq.* (the "NYCHRL") and the New Jersey Law Against Discrimination, New Jersey Statutes Annotated, 10:5-12, *et seq.* ("NJLAD").

## ADMINISTRATIVE PROCEDURES

22.     Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq* .  Plaintiff received a Notice of Right to Sue and asserts her  Title VII claims within 90 days of receipt of the EEOC's Notice of Right to Sue.

23.     Any and all other prerequisites to the filing of this suit have been met.

---

[1]     If Defendant Bramshill's claims were genuine, Defendant would have threatened the claims immediately and would have filed irrespective and well before Plaintiff's discrimination claims were addressed with counsel.  The viability of Defendant's claims is completely independent of Plaintiff's discrimination claims and the fact that Gordon & Rees advised that Defendant's claims would only be filed *in response* to Plaintiff's lawsuit defies any logic or sincere argument.

## JURISDICTION AND VENUE

24.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the Equal Pay Act.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

25.     Pursuant to 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e), venue is proper in this district because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

26.     Plaintiff Ashley Pullen is a former employee of Bramshill and is a resident of the State of New Jersey.  Ms. Pullen was hired to work in Bramshill's New York City office, which was to be opened shortly after Ms. Pullen's hiring.  In the interim, Ms. Pullen worked for Bramshill both in its New Jersey offices as well as in an office in New York City paid for by Bramshill.  At the time of her termination, Ms. Pullen worked approximately 25% of the time in New Jersey and 75 % of the time in New York City.

27.     Defendant Bramshill Investments, LLC is a Foreign Limited Liability Company existing under the laws of the State of New Jersey with a principal place of business at 411 Hackensack Ave, 9th Floor, Hackensack, New Jersey 07601.

28.     Defendant Art DeGaetano is the Chief Investment Officer and Co-Founder of Bramshill.  At all relevant times, Mr. DeGaetano met the definition of an "employer" under all applicable statutes and exercised the authority to control Ms. Pullen's employment, including her work assignments, pay and responsibilities.

29.     Defendant Stephen Selver is the Chief Executive Officer of Bramshill.  At all relevant times, Mr. Selver met the definition of an "employer" under all applicable statutes and exercised the authority to control Ms. Pullen's employment, including her work assignments, pay and responsibilities.

## FACTUAL ALLEGATIONS

### I.     BACKGROUND

30.     In 2006, Ms. Pullen graduated *magna cum laude* from the University of Colorado.

31.     After working for a few years in the finance sector, Ms. Pullen decided to get her master's degree at New York University ("NYU").  In 2013, Ms. Pullen graduated *summa cum laude* with distinction, an honor that was awarded to only approximately 10% of her class.

32.     Upon graduating from NYU, Ms. Pullen worked in Marketing and Investor Relations at Hound Partners, LLC, an investment management firm of $4 billion seeded by the prestigious Julian Robertson of Tiger Management.

33.     From there, Ms. Pullen continued to work at a variety of billion-dollar level funds, where she marketed and promoted each fund to the global institutional investor community.

34.     In each of her positions, Plaintiff played a key role in exponentially increasing her employers' assets and strengthening investor relationships.

35.     In 2016, Ms. Pullen was asked to move to Singapore to lead business development efforts for a $3.7 billion investment management firm, APS Asset Management.

36.     As the Director of Business Development at this fund, Ms. Pullen was responsible for coverage of 510 institutional investors globally and, in only five months, Ms. Pullen created exposure to an additional 30,000 institutional investors.

37.     In September 2017, Ms. Pullen, decided to launch her own firm, SparHawk Advisory, LLC ("SparHawk").

38.     Ms. Pullen created SparHawk to help move the hedge fund industry forward and assist women-owned alternative asset managers with instituting best practices and creating infrastructure around the marketing process to successfully raise capital.  SparHawk is not and never has been a third-party marketer.

39.     Based on her prior experiences, Plaintiff had successfully built a career and was a recognized thought leader with respect to institutional marketing in the alternative investments sector within Wall Street – a field that is dominated by men who are often twice her age.

40.     Over the course of the last decade, Ms. Pullen has become a well-known institutional marketer.  She has been recognized for combining vision, creativity and industry acumen to develop fund-specific asset-raising campaigns by targeting her global network of over 2,000 institutional investor contacts.

41.     Ms. Pullen also has developed and maintained specialized knowledge pertaining to the strategic targeting of investors, marketing materials, compliance, consultant relations, operational infrastructure, CRM implementation, branding and messaging.

II.     <u>MS. PULLEN JOINS BRAMSHILL</u>

42.     In March 2019, Ms. Pullen was introduced to Bramshill by a common contact, Tim Gullickson.

43.     Stephen Selver, the Chief Executive Officer of Bramshill, approached Plaintiff after Mr. Gullickson gave Mr. Selver a list of potential marketers and told him that Ms. Pullen was "the best option."

44.     On March 21, 2019 Mr. Selver interviewed Ms. Pullen for an Executive Director position with a focus on institutional marketing and creating exposure within the investor community.

45.     On April 30, 2019, after a swift interview process, Mr. Selver offered Ms. Pullen the position of Executive Director and she accepted.

46.     On May 20, 2019, Ms. Pullen began working at Bramshill.[2]  It was Ms. Pullen's understanding that she was to report to Mr. Selver and work in tandem with the other institutional marketing-focused Executive Director, John Wasilewski, who had begun working for the Firm only one week before Ms. Pullen.  Mr. Wasilewski and Ms. Pullen had the same exact title and role, and very similar backgrounds.

47.     The institutional marketing team was comprised of Ms. Pullen, Mr. Wasilewski, Joshua Bubbs, an Executive Director who had been with the Firm since 2017, Nicolas Amato, a Managing Director, and Art DeGaetano, the Chief Investment Officer and Co-Founder of Bramshill.

III.    **MS. PULLEN IS DISCRIMINATED AGAINST AND MARGINALIZED BECAUSE SHE IS A WOMAN**

48.     Right away, Ms. Pullen noticed that there were very few women at the Firm – only four out of the Firm's 22 employees were women.  Ms. Pullen was of course concerned by the underrepresentation of women at the Firm, and hoped that this would not have a negative impact on her day-to-day work.

---

[2]     Ms. Pullen had been told that she would be working out of the New York office as soon as it opened the first week of June.  However, Bramshill's New York office ultimately opened two months late on August 6, 2019 and Ms. Pullen ended up working 75% of her time out of a co-working space in Manhattan, which Bramshill paid for.

49.     Unfortunately, however, Plaintiff quickly saw that she was being marginalized and passed over for opportunities in favor of her male colleagues; particularly Mr. Wasilewski – who had been hired for exact the same role as Plaintiff.

50.     By way of example only, the following illustrate the discriminatory way Ms. Pullen was treated relative to her equally qualified male peer(s):

- On June 4, 2019, Mr. Selver requested that Plaintiff and Mr. Wasilewski submit investor names for their respective potential investor coverage lists.[3]  Dubiously, in submitting this list, Mr. Selver gave *no parameters* to Mr. Wasilewski but requested that Ms. Pullen *only* submit names of investors within the U.S. and Canada.  Mr. Selver also allowed Mr. Wasilewski to submit a limitless number of investors but requested that Ms. Pullen keep her investor list to approximately 150 names.  Ultimately, Ms. Pullen was entitled to coverage of only 159 investors, *almost 100 fewer* investors than Mr. Wasilewski was authorized to cover.[4]  Of course, this would have a significant negative impact on Ms. Pullen's ability to retain investors and, in turn, earn compensation.

- On June 12, 2019, coverage for Synergy Fund Management ("Synergy"), a foreign firm based in Hong Kong, was given to Mr. Wasilewski despite the fact that Ms. Pullen had substantial connections to Synergy.  Had Ms. Pullen been authorized to conduct outreach to foreign investors like the rest of her male colleagues, she likely would have been covering Synergy.  Again, this discriminatory coverage assignment would negatively impact Ms. Pullen's ability to earn compensation relative to the opportunities given to her male peers.

- In mid-June, 2019, Ms. Pullen asked Mr. Selver if she could attend the Managed Funds Association conference in Chicago, explaining that the conference would be a tremendous opportunity to reconnect with investors.  Mr. Selver outright disregarded Ms. Pullen's request to go to the conference and – to add insult to injury – Mr. Selver attended with Mr. Wasilewski instead.

- On June 25, 2019, Mr. Selver called Plaintiff and accused her of stealing investor coverage of the Toronto-based entity, Innocap.  When Ms.

---

[3]     Institutional marketers are typically compensated based on the type of investors they cover, as that dictates the investment size.

[4]     Mr. Wasilewski had coverage of 254 investors while Mr. Selver and Mr. Bubbs each had coverage of approximately 210 investors.

Pullen tried to explain that Mr. Selver was wrong and that Innocap was in fact on her coverage list, he began berating her and calling her "**combative**" and "**aggressive.**"  These are, of course, gender-biased comments that never would have been made to a man.  Indeed, later that afternoon, Mr. Selver clearly felt guilty about his inappropriate conduct and texted Ms. Pullen saying, "I made a mistake earlier."

- To make matters worse, on June 27, 2019, Ms. Pullen sent Mr. Selver an email expressing her concern that Mr. Wasilewski was trying to poach both Rock Creek and Texas Teachers – two of Ms. Pullen's designated investors – from Ms. Pullen's list.  In light of the accusations Mr. Selver had made towards her just two days earlier, Ms. Pullen expected that Mr. Selver would at the very least have a conversation with Mr. Wasilewski about this unethical behavior.  Instead, Mr. Selver completely ignored Ms. Pullen's concerns, responding that "all of us have connections there."  To say that this was disappointing to Ms. Pullen would be an understatement; Ms. Pullen was flabbergasted by the double standard to which she was subjected.

51.    Over the course of the month of June 2019, Ms. Pullen grew discouraged by the continuous marginalization she was experiencing at Bramshill.  As such, she made explicit complaints to Mr. Selver regarding this gender discrimination.

52.    On June 10, 2019 Ms. Pullen had an in-person conversation with Mr. Selver during which she explained that her inequitable coverage of investors relative to her colleague Mr. Wasilewski was "**a matter of gender discrimination**."

53.    On June 27, 2019, Ms. Pullen was again explicit in her complaint to Mr. Selver, stating that "**my male colleague [John]** is poaching investors off of my list.  Why has this not been addressed?"  Mr. Selver ignored Ms. Pullen's complaint of discrimination and instead, he simply instructed Ms. Pullen to submit additional investors to her list.[5]

---

[5]    Mr. Selver also told Ms. Pullen that foreign investors were "not a priority" at this time, but of course, Mr. Selver failed to communicate this to the rest of the marketing team, who continued to reach out to foreign entities.

54.     Then, on July 8, 2019, the Firm's view of Plaintiff really came into clear focus for her when Mr. DeGaetano tasked Ms. Pullen at an internal sales meeting with overseeing "events."

55.     Notably, Mr. DeGaetano had previously touted to Ms. Pullen that his ex-wife had planned all the "firm outings" including the holiday parties and Firm offsite retreats.  It was obvious to Ms. Pullen that she was being charged with "events" solely because she was a woman.

56.     Indeed, in contrast, in connection with the same meeting, Mr. Bubbs was to create a "pipeline" to show existing investor activity, while Mr. Amato and Mr. Wasilewski were commissioned with re-creating all firm materials (something Ms. Pullen had years of experience doing and had previously been working on).

57.     After the group meeting, Ms. Pullen again spoke with Mr. Selver about the discriminatory assignment and complained that "event-planning" lacked any analytical or substantive work.

58.     He responded, missing the mark completely, "we thought events was good for you – that's why I hired you."  Plaintiff was stunned and rendered speechless by Mr. Selver's patronizing statement, which completely undermined her reputation and level of expertise.

59.     Of course, women have historically and systematically been relegated to "event-planning" roles while deemed unqualified for more analytical or technical positions.  Ms. Pullen could not believe that, in 2019, she was being subjected to the sexist and outdated stereotype that women are fit only for administrative busy-work rather than substantive intellectual work.

13

IV.    **MS. PULLEN IS PAID SIGNIFICANTLY LESS THAN HER MALE COUNTERPART, MR. WASILEWSKI**

60.    The gender discrimination and mistreatment extends to compensation.

61.    Upon information and belief, Ms. Pullen has been dramatically underpaid relative to her male counterpart, Mr. Wasilewski, who has an identical role and/or responsibilities, including reaching out to investors, organizing events and roadshows, setting up meetings with potential investors and general marketing and branding for the Firm.  Both Mr. Wasilewski and Ms. Pullen had the same amount of experience and the same type of experience in institutional investor marketing.

62.    Upon information and belief, Ms. Pullen's bonus compensation would have been approximately ten times less than that of Mr. Wasilewski and substantially less than other male Bramshill employees with similar skill and with similar, or even less, experience.  This is because Mr. Wasilewski was given approximately ten times the amount of potential investor assets to cover than Ms. Pullen.

63.    Defendants' decision to empower Mr. Wasilewski to have a drastically larger pool of investment opportunity – which would have a direct impact on his pay such that his total compensation would be significantly higher relative to Ms. Pullen's – is not based on a bona fide factor other than or unrelated to gender.

64.    Indeed, to the extent Bramshill claims that Ms. Pullen is paid less than certain male counterparts because she does not have as many investor contacts on her investor-list, such a claim only proves that male employees at Bramshill have been and continue to be favored by Bramshill with the most prime opportunities and investors that carry the greatest compensation.

14

**V.    MS. PULLEN IS SUBJECTED TO A HOSTILE WORK ENVIRONMENT AND BOYS' CLUB ATMOSPHERE**

65.    This unequal treatment based on gender was further underscored by the explicit inappropriate comments to which Ms. Pullen was exposed during her employment at Bramshill.

66.    Ms. Pullen was constantly made to feel like she had been hired primarily for her looks.  By way of example only:

- On a daily basis, Mr. Selver **leered** at Ms. Pullen and told her that she "**looked nice**" or was wearing "**a nice outfit.**"  These comments, coming from her older, male boss made Ms. Pullen extremely uncomfortable.  Of course, he never commented on the male employees' outfits or looks.

- On July 12, 2019, while in Bermuda at an offsite retreat, after Mr. Selver had had a few drinks, he **grabbed Ms. Pullen by her arm and pushed her** towards an investor she had never met before – effectively flaunting Ms. Pullen as though she were a trophy or a Barbie doll – in order to gain business.  In fact, as he pushed Ms. Pullen towards the investor, he exclaimed, in sum and substance, "**Look! You would be working with *her*.**"

- On July 13, 2019, during a work dinner in Bermuda, Justin Byrnes, a portfolio manager at the Firm, completely unsolicited exclaimed to Laura Simione, "**your new boobs look great!**" regarding a recent procedure she had gotten done on her breasts.  Ms. Simione was visibly uncomfortable and Ms. Pullen was understandably disturbed by the comment.

67.    Moreover, throughout the course of Ms. Pullen's employment at Bramshill, Ms. Pullen became aware that there were numerous "male-only" Firm events from which she was excluded.  These events further emphasized Ms. Pullen's feeling that she was working in a very hostile and sexist Firm.

68.    For example, on June 13, 2019 and June 14, 2019, Bramshill organized two all-male golf outings.  Ms. Pullen was not invited to these outings, nor were any of the other three women working for Bramshill.

15

69.     Additionally, Mr. Selver also described to Plaintiff on multiple occasions the various all-male events he hoped to host at different locales such as the Nexus Club, the Soho House, as well as at the upcoming Super Bowl.

70.     Nonetheless, even against this patently misogynist backdrop, Ms. Pullen had the courage to continue to make complaints to Mr. Selver about the gender discrimination she was experiencing.

## VI.    MS. PULLEN REPEATEDLY ENGAGES IN PROTECTED ACTIVITY

71.     As mentioned above, Ms. Pullen first made Mr. Selver aware that she was upset about "gender discrimination" and the gender-based animus she was experiencing on June 10, 2019 in an in-person conversation.

72.     Then, on July 22, 2019, Ms. Pullen additionally had the courage to raise concerns regarding SEC violations during an internal sales call with various Firm employees.[6]

73.     Mr. Wasilewski had indicated that he wanted to distribute preliminary performance estimates to prospective investors.  According to Rule 206(4)-1 (the "Advertising Rule") under the Investment Advisers Act of 1940 (the "Advisers Act" 15 U.S.C. § 80b-1) this could be construed as circulating or distributing an advertisement that contains an untrue statement of material fact, or that is otherwise false or misleading.

74.     Preliminary performance estimates can, however, be distributed to current investors.  Plaintiff told Mr. Selver that this disclosure would be completely illegal and a violation of SEC rules.

---

[6]     The participants on the call were Ms. Pullen, Mr. Bubbs, Mr. Wasilewski, Martin Burke, Ms. Simione and Mr. Selver.

16

75.     As expected, Ms. Pullen's complaint was wholly ignored and Mr. Selver dismissed her comments as irrelevant and insignificant on the call.

76.     Then, on July 30, 2019 Mr. Selver called Plaintiff and began berating her and accusing her of "causing tension" within the marketing team.

77.     Using typical sexist language, he accused Plaintiff of having an "aggressive" communication style with the other men on the marketing team.

78.     Obviously, Mr. Selver had never criticized Ms. Pullen's colleagues for being too aggressive or assertive; in fact, he had often praised Mr. Wasilewski and Mr. Bubbs for their forceful and emphatic working styles.[7]

79.     This conduct is completely unlawful under the anti-discrimination laws.  Indeed, in an opinion written in the landmark Supreme Court case, *Price Waterhouse v. Hopkins*, Justice William J. Brennan, Jr. wrote:

> An employer who objects to aggressiveness in women but whose positions require this trait puts women in an intolerable and impermissible Catch 22: out of a job if they behave aggressively and out of a job if they do not.  Title VII lifts women out of this bind.[8]

80.     Ms. Pullen was offended and shocked at Mr. Selver's accusation that she was the cause of the "tension" within the marketing team.

81.     Ms. Pullen stated to Mr. Selver very clearly that "**the only reason this tension exists is because you are running the marketing team like a boys' club.**"

---

[7]     David G. Smith *et al.*, *The Different Words We Use to Describe Male and Female Leaders*, Harvard Business Review, May 25, 2018, https://hbr.org/2018/05/the-different-words-we-use-to-describe-male-and-female-leaders.

[8]     *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989).

82.     Instead of addressing Ms. Pullen's complaint of gender discrimination, Mr. Selver neglected to address this issue and retaliated against Plaintiff by terminating her employment a mere seven days later.

**VII.    MS. PULLEN IS TERMINATED IN RETALIATION FOR HER PROTECTED COMPLAINTS**

83.     In a blatant act of retaliation, on August 7, 2019, only one week after she complained about the "boys' club" environment at the Firm, Ms. Pullen's access to Bramshill's systems was cut off abruptly.

84.     The following day, Mr. DeGaetano called Ms. Pullen and terminated her, pretextually claiming that Ms. Pullen had engaged in a compliance violation by sending "confidential information" to her personal email.

85.     Following this call, Ms. Pullen sent an email to Mr. DeGaetano explaining that she had never stolen anything from the Firm and had only used her personal laptop – for which she had previously received approval – so she could use two screens to do her work outside of the office.

86.     This was necessary because Bramshill never supplied Ms. Pullen with an adequate computer setup in the temporary office space she used during her employment.

87.     In her email, Ms. Pullen further cited multiple clauses within the Bramshill Compliance Manual and Employment Agreement to show that she had not violated any Bramshill policies whatsoever.

88.     It is not a coincidence that Ms. Pullen was terminated just ***days*** after she complained to Mr. Selver about potential SEC violations and that he was running Bramshill like a "boys' club."

18

89.     The pretextual nature of this justification for Ms. Pullen's termination is even more apparent given that Ms. Pullen did not violate her employment agreement and had never been told that she could not use her personal computer or SparHawk email account – which is on a private server – to advance her work productivity.

90.     Bramshill's sudden termination of Ms. Pullen makes clear that the decision to terminate her is nothing more than mere pretext, designed to conceal the real discriminatory and retaliatory reasons the Firm terminated Ms. Pullen – because of her gender and because she had just days earlier displayed the nerve to confront Mr. Selver about his inappropriate and unlawful conduct.

91.     Bramshill's inconsistent application of "compliance procedures" additionally reveals that Ms. Pullen's termination was a farcical ruse drummed up to conceal Bramshill's discriminatory and retaliatory reasons for her termination.

92.     Specifically, during Ms. Pullen's employment, numerous Bramshill male employees – including, but not limited to, COO Mr. Jester, CCO Mr. Nieporte, Senior Portfolio Manager Mr. Hirshfield, Executive Director Mr. Bubbs, Executive Director Mr. Wasilewski and Operations Associate Mr. Jones,– had sent over 30 emails to Plaintiff's personal SparHawk email without repercussion or further investigation.

93.     These emails included documents related to Bramshill's proprietary trading formulas, investor information and preliminary performance figures, which were of a higher level of confidentiality than the documents related to Ms. Pullen's alleged compliance violation.

94.     The male employees that sent these documents to Ms. Pullen's SparHawk email not only remain employed at Bramshill, but they were also not warned or reprimanded in any

way, and likely did not have their email accounts searched by a third-party vendor, as did

Plaintiff.

## VIII.  ONGOING RETALIATION AGAINST MS. PULLEN SINCE HER TERMINATION

95.    Bramshill's actions since Ms. Pullen's termination further demonstrate that

Bramshill does not have actual concerns related to the security of its data and is only trying to

punish Plaintiff further for engaging in protected activity.

96.    For more than six weeks after Bramshill had terminated Ms. Pullen, Bramshill

had not requested even once that Ms. Pullen delete any of the documents that they claim she sent

to herself in violation of compliance rules.  In fact, Ms. Pullen continues to have access, even

after her termination, to an application on her phone – Sync – that contains sensitive Bramshill

documents.[9]  Further, Ms. Pullen continues to receive emails from Bramshill to her personal

SparHawk address with sensitive performance information, with the latest email dated

September 16, 2019.

97.    If Bramshill's stated basis for Ms. Pullen's termination was genuine, it would

have at the very least taken some real measures to protect its data and information immediately

upon the conclusion of Ms. Pullen's employment.

98.    To make matters worse, on August 21, 2019, two weeks after her termination, Ms.

Pullen became aware that Bramshill sent an email to the Women in Asset Management Awards

during the week of August 12, 2019, attempting to have Ms. Pullen stripped of her nomination

for "Business Role Model of the Year."

---

[9]    Bramshill never requested that Ms. Pullen delete the application on her cell phone that provides access to all of Bramshill's documents.

99.     Ms. Pullen was nominated by her own network of contacts for this award and the shortlist of candidates was pre-determined by one's overall contributions to the positive encouragement of women in finance.  Ms. Pullen was certainly not shortlisted for this category based on her three-month tenure at Bramshill.

100.     There is absolutely no justification for Mr. Selver, Mr. DeGaetano and Bramshill to request that Ms. Pullen be stripped of this nomination other than pure spite and retaliation for Ms. Pullen having complained about sexism and gender discrimination to Mr. Selver.

101.     Then, on August 28, 2019, counsel for Ms. Pullen, Wigdor LLP ("Wigdor") sent a letter to Bramshill outlining Plaintiff's claims of gender discrimination and retaliation and the intent to litigate them.  Wigdor requested a response by September 8, 2019.

102.     On September 3, 2019, Wigdor received a letter from Bruce Atkins at Deutsch Atkins, P.C. requesting an extension to September 12, 2019 of the requested response deadline. However, on September 12, 2019, counsel for Ms. Pullen still had not heard from Mr. Atkins and inquired as to when he could expect to have a discussion.  Mr. Atkins responded that he was only meeting with his client for the first time on Monday, September 16, 2019, and that he would be in a position to discuss *for the first time* on Tuesday, September 17, 2019.

103.     Then, instead of engaging in a discussion as he had represented, Mr. Atkins simply emailed Wigdor that Bramshill had insurance and that the insurance attorneys would respond.

104.     On September 18, 2019, Wigdor received a retaliatory and threatening email from Bramshill's insurance counsel, Mr. Gallo, at Gordon & Rees, asking for an additional two weeks to "fully investigate the allegations" and stating the following:

21

Presently, we are aware that your client ***downloaded and stole*** confidential and proprietary information and documents from Bramshill. More specifically, wrongful [*sic*] converted numerous proprietary contact list containing names, addresses, and telephone numbers; client list containing investors and their investments; marketing materials; among other confidential Bramshill property. These are very serious allegations that could (and will) warrant counterclaims under the New Jersey Computer Related Offenses Act, and other common law claims. ***If your client proceeds with filing a Complaint, Bramshill has authorized my firm to defend the claims, and file counterclaims concerning your client's wrongdoing.***

105.    Obviously, given that Bramshill waited more than a month to make this threat, it is well aware that no legitimate basis for any counterclaim exists. Indeed, if any legitimate basis existed for legal action against Ms. Pullen, Bramshill would have filed such action when Ms. Pullen was terminated or shortly thereafter. It is clear that the only reason that this threat was made is because Ms. Pullen retained counsel in connection with her claims of unlawful discrimination and retaliation.

106.    As if this were not enough of a clear and explicit retaliatory threat, Gordon & Rees then sent not one but two separate harassing letters on September 19, 2019 and September 20, 2019 demanding that, among other ridiculous and baseless requests, Ms. Pullen "acknowledge and agree to turn over her ***personal*** laptop to an independent forensic expert (to be identified by Bramshill) to inspect and examine her computer databases and hard drives, cloud storage accounts, electronic files and accounts, and other metadata." (Emphasis added).

107.    Gordon & Rees's sudden and menacing demands and letters in and of themselves illustrate the true motive behind Bramshill's purported justification for terminating Ms. Pullen – to intimidate a legitimate victim of discrimination.

108.    On the morning of September 24, 2019, Ms. Pullen filed this lawsuit against Defendants as is her legal right.  Then, true to their word, in the afternoon of September 24, 2019, Gordon & Rees, on behalf of Defendant Bramshill, filed a retaliatory complaint alleging six spurious causes of action against Ms. Pullen, as well as a motion for a temporary restraining order and preliminary injunction, in the District of New Jersey.

109.    These counterclaims and motion for a temporary restraining order are clearly an intimidation tactic employed to quell Ms. Pullen's efforts to exercise her legal rights, and act as a cover for the gender discrimination Ms. Pullen endured and had the nerve to complain about during her employment with Defendants.

110.    It is exactly this type of retaliatory action that serves as a veiled means of silencing women and victims of gender discrimination who display the courage to complain about the unlawful discrimination they are subjected to.

## FIRST CAUSE OF ACTION
### (Violations of the Equal Pay Act)
#### *Against All Defendants*

111.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

112.    During the period of employment of Plaintiff, Defendants were subject to the provisions of the EPA.  During that time, Defendants required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff at a rate of pay, including salary and bonus, less than such male employees.  The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a factor other than gender.

113.    Defendants engaged in patterns, practices and/or policies of employment which willfully discriminated against Plaintiff on the basis of her gender and by paying Plaintiff a lesser rate of pay, including salary and bonus, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishments.

114.    By the actions described above, among others, Defendants have violated the EPA.

115.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the EPA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

116.    Plaintiff is further entitled to liquidated damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Title VII)
### *Against All Defendants*

117.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

118.    By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of her complaints of discrimination by terminating her employment, threatening to assert counterclaims and filing a separate action against Ms. Pullen following the filing of this action.

119.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

120.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression,

humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and other emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

121.    Defendants' unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under Title VII for which Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (Gender Discrimination in Violation of Title VII)
### *Against All Defendants*

122.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

123.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her gender in violation of Title VII by subjecting her to disparate treatment based upon her gender, including, but not limited to, denying her equal terms and conditions of her employment, verbal abuse and derogatory comments

124.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

125.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

126.    Defendants' unlawful and discriminatory actions were intentional, done with

malice, and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under Title VII for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
### *Against All Defendants*

127.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

128.    By the actions described above, among others, Defendants violated the NYSHRL in that they unlawfully retaliated against Plaintiff for her engagement in protected activities and her opposition to the unlawful conduct of Defendants in violation of the NYSHRL, including, *inter alia*, by terminating her employment and threatening to assert counterclaims and filing a separate action against Ms. Pullen following the filing of this action.

129.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

130.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

**FIFTH CAUSE OF ACTION**
**(Gender Discrimination under the NYSHRL)**
***Against All Defendants***

131.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

132.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by denying her the opportunity to work in an employment setting free of unlawful discrimination.

133.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, unwanted touching, verbal abuse and derogatory comments.

134.    Defendants have discriminated against Plaintiff on the basis of gender in violation of the NYSHRL by, *inter alia*, terminating her employment on the basis of her gender.

135.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

136.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

## SIXTH CAUSE OF ACTION
### (Aiding and Abetting Discrimination under the NYSHRL)
### *Against Defendants Selver and DeGaetano*

137.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

138.    Defendants Selver and DeGaetano knowingly or recklessly aided and abetted the unlawful employment practices and discrimination against Plaintiff in violation of the NYSHRL.

139.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which she is entitled to an award of monetary damages and other relief.

140.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

## SEVENTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)
### *Against All Defendants*

141.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

142.    By the actions described above, among others, Defendants violated the NYCHRL in that they unlawfully retaliated against Plaintiff for her engagement in protected activities and her opposition to the unlawful conduct of Defendants in violation of the NYCHRL, including,

*inter alia*, by terminating her employment and threatening to assert counterclaims and filing a separate action against Ms. Pullen following the filing of this action.

143.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

144.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

145.    Defendants' unlawful and retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

### EIGHTH CAUSE OF ACTION
**(Gender Discrimination under the NYCHRL)**
***Against All Defendants***

146.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

147.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by denying her the opportunity to work in an employment setting free of unlawful discrimination.

148.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by fostering, condoning, accepting, ratifying and/or otherwise failing

to prevent or to remedy a hostile work environment that has included, among other things, unwanted touching, verbal abuse and derogatory comments.

149.    Defendants have discriminated against Plaintiff on the basis of gender in violation of the NYCHRL by, *inter alia*, terminating her employment on the basis of her gender.

150.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

151.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

152.    Defendants' unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## NINTH CAUSE OF ACTION
### (Aiding and Abetting Discrimination under the NYCHRL)
### *Against Defendants Selver and DeGaetano*

153.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

154.    Defendants Selver and DeGaetano knowingly or recklessly aided and abetted the unlawful employment practices and discrimination against Plaintiff in violation of the NYCHRL.

155.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income,

30

compensation and benefits, for which she is entitled to an award of monetary damages and other relief.

156.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

157.    Defendant Selver's and Defendant DeGaetano's unlawful discriminatory and retaliatory actions constitute malicious, willful and wanton violations of NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**TENTH CAUSE OF ACTION**
**(Retaliation in Violation of the NJLAD)**
***Against All Defendants***

158.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

159.    By the actions described above, among others, Defendants violated the NJLAD in that they unlawfully retaliated against Plaintiff for her engagement in protected activities and her opposition to the unlawful conduct of Bramshill in violation of the NJLAD, including, *inter alia*, by terminating her employment and threatening to assert counterclaims and filing a separate action against Ms. Pullen following the filing of this action.

160.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NJLAD, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

161.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NJLAD, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

162.    Defendants' unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NJLAD for which Plaintiff is entitled to an award of punitive damages.

## ELEVENTH CAUSE OF ACTION
### (Gender Discrimination under the NJLAD)
#### *Against All Defendants*

163.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

164.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NJLAD by denying her the opportunity to work in an employment setting free of unlawful discrimination.

165.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NJLAD by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile environment that has included, among other things, unwanted touching, verbal abuse and derogatory comments.

166.    Defendants have discriminated against Plaintiff on the basis of gender in violation of the NJLAD by, *inter alia*, terminating her employment on the basis of her gender.

167.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NJLAD, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

168.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NJLAD, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

169.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NJLAD for which Plaintiff is entitled to an award of punitive damages.

170.    Plaintiff is further entitled to reasonable costs and attorneys' fees.

## TWELVETH CAUSE OF ACTION
### (Aiding and Abetting Violations of the NJLAD)
### *Against Defendants Selver and DeGaetano*

171.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

172.    Defendants Selver and DeGaetano knowingly or recklessly aided, abetted and directly participated in the unlawful employment practices perpetrated against Plaintiff in violation of the NJLAD.

173.    As a direct and proximate result of Defendant Selver's and Defendant DeGaetano's unlawful conduct in violation of the NJLAD, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

33

174.    As a direct and proximate result of Defendant Selver's and Defendant DeGaetano's unlawful conduct in violation of the NJLAD, Plaintiff has suffered and continues to suffer mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against the Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants described herein violate the laws of the United States, the State of New Jersey and the State and City of New York;

B.    An award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for all monetary and/or economic damages;

C.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical and mental injuries;

D.    An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

E.    An award of punitive damages;

F.    An award of liquidated damages;

G.    Reinstatement;

H.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and,

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: January 17, 2020          **WIGDOR LLP**
     New York, New York

By: _____
     Bryan L. Arbeit
     Douglas H. Wigdor
     (admitted *pro hac vice*)
     Michael J. Willemin
     (admitted *pro hac vice*)
     Julia L. Elmaleh-Sachs
     (admitted *pro hac vice*)

     85 Fifth Avenue
     New York, NY 10003
     Telephone: (212) 257-6800
     Facsimile: (212) 257-6845
     barbeit@wigdorlaw.com
     dwigdor@wigdorlaw.com
     mwillemin@wigdorlaw.com
     jelmaleh-sachs@wigdorlaw.com

     *Attorneys for Plaintiff*

35