**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **BRAMSHILL INVESTMENTS, LLC** | ) | |
| | ) | |
| **Plaintiff,** | ) | Civil Action No. 2:19-cv-18288- |
| | ) | JMV-JBC |
| **v.** | ) | |
| | ) | JURY TRIAL DEMANDED |
| **ASHLEY PULLEN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**AMENDED VERIFIED COMPLAINT**</u>

Plaintiff Bramshill Investments, LLC ("Bramshill" or "Plaintiff"), by and through its undersigned counsel, files the following Amended Verified Complaint against Ashley Pullen ("Defendant"). In support thereof, Plaintiff states as follows:

## I.    INTRODUCTION

1.    Bramshill is an employee owned alternative asset management firm that specializes in investment opportunities across the fixed income universe in sectors such as corporate bonds, preferred securities, municipal bonds, structured credit and credit-themed equities.

2.    Founded in 2012, Bramshill's team-oriented approach and firm philosophy have been the core reasons for the company's success in investing, client relationships, and risk management.

3.    Plaintiff takes great pride in providing absolute return solutions within fixed income and income producing securities to its clients, and treating its clients and employees as family.

4.    Defendant was welcomed into the Bramshill family on May 20, 2019, and was handed the coveted role of Executive Director, a high base salary, ample vacation (and even allowed her to take two separate vacations within 10 weeks at the company), and was provided every tool she needed to help the Plaintiff run its business.

1

5.     However, instead of returning the Plaintiff's generosity, the Defendant undertook a concerted and planned effort to surreptitiously exploit the Plaintiff's resources and confidential information and operate an improper, competing boutique firm focused on creating a process advantage for women-owned, high-quality investments across venture capital, hedge funds and private equity for the entirety of her employment with Plaintiff.

6.     Further adding insult to injury, Defendant maliciously, systematically and without authorization or authority, wrongfully took possession of the Plaintiff's confidential, proprietary, and trade secret information, through improper means, and in violation of her duties and obligations to Plaintiff.

7.     All of the aforementioned conduct is in violation of applicable federal and state law, her Employment Agreement, Bramshill's policies and protocol, and Defendant's duty of loyalty to the Plaintiff, necessitating this lawsuit to hold Defendant accountable for the damage she caused to Plaintiff's business, and to ensure that the Plaintiff can reclaim and protect its confidential information.

8.     Despite Bramshill's request to Pullen to return confidential, proprietary, and trade secret information – which was initially made at Pullen's termination meeting and again the following week in writing – Pullen refused.  It was not until Bramshill filed a Motion for Preliminary Injunction and Temporary Restraints that Pullen finally returned 1,163 pages of documents that contained confidential, proprietary, and trade secret information that belonged to Bramshill.  Incredibly, these documents contained numerous e-mail communications from Ashley Pullen's Bramshill e-mail account to her SparHawk e-mail account.

9.    Additionally, Pullen executed an Affidavit stating that she returned everything in her possession; destroyed all electronic copies and further agreed not to use such documents or information to compete with Bramshill.

10.    However, this hardly exonerates Pullen from her wrongdoing and deceitful conduct, which has caused damages and will continue to cause damages to Bramshill and its business operations[1].

## II.    PARTIES

11.    Plaintiff Bramshill is a New Jersey limited liability company with its principal place of business located at 411 Hackensack Avenue, 9th Floor, Hackensack, NJ 07601.

12.    Bramshill is an asset management firm that specializes in providing absolute return solutions within fixed income and income producing securities.

13.    Defendant is an individual and was formerly employed by Plaintiff. Upon information and belief, she is a resident of the State of New Jersey, residing at 80 Park Avenue, Apt. 3C, Hoboken, NJ 07030.

## III.    JURISDICTION AND VENUE

14.    Jurisdiction is proper in this Court under 28 U.S.C. § 1331, as Plaintiff asserts claims arising under the laws of the United States.

---

[1] In September 2019, Bramshill requested an independent forensic inspection of Pullen's personal laptop to determine the extent of Bramshill's damages. That is, since Pullen admittedly transferred Bramshill's confidential documents to her SparHawk e-mail account, and to her personal laptop, a forensic expert will be able to determine the extent and scope that Pullen used (and continues to use) the confidential documents to compete with Bramshill. To date, Plaintiff has refused to turn over her personal laptop. Bramshill intends to renew its request for Pullen's laptop during the discovery period.

15.     Jurisdiction over Plaintiff's state law claims is proper in this Court under 28 U.S.C. § 1367, because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy.

16.     This Court has jurisdiction over Defendant as she has done business in New Jersey and in this District, and Plaintiff's claims in this action arose out of those contacts.   Additionally, Plaintiff knowingly and voluntarily executed an employment agreement with Bramshill consenting to jurisdiction of any claims arising under that agreement, in the State of New Jersey.

17.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the Plaintiff's claims occurred in this District, and Bramshill's headquarters are located in Hackensack, New Jersey.

## IV.     SUMMARY OF KEY VIOLATIONS

18.     In disregard of her duties and obligations to Plaintiff, and before the termination of her employment with Plaintiff, Defendant used, misappropriated, and converted Plaintiff's confidential and proprietary information and documents including master client lists containing investor's names, addresses, and telephone numbers; marketing materials; and proprietary investor lists and strategies containing investment amounts and confidential information, to operate a competing company, without Plaintiff's authorization or knowledge.

19.     In September 2017, and prior to her employment at Bramshill, Defendant launched her own advisory firm, SparHawk Advisory, LLC ("SparHawk").   Upon information and belief, Plaintiff created SparHawk to assist women-owned alternative asset managers with instituting best practices and creating infrastructure around the marketing process to successfully raise capital.

20.     In furtherance of this scheme and in direct violation of Bramshill's Code of Ethics, Compliance Manual, and Defendant's Employment Agreement, and before the termination of her

4

employment with Plaintiff, Defendant accessed, used, misappropriated, and otherwise acquired data of outside marketers with whom Bramshill engages regularly and which data Bramshill is not entitled to share, in addition to Plaintiff's financial and operational information; proprietary business strategies; trade-secrets; investors' personal information; marketing materials; client contact information; client personal data; and the confidential data of the Plaintiff's employees (hereinafter, the "Confidential/Proprietary Information") to operate a competing company SparHawk, without Plaintiff's authorization or knowledge.

21.     Since her employment relationship with Plaintiff was terminated, Defendant has continued to use and possess the Plaintiff's Confidential/Proprietary Information in furtherance of her competing business activities.

22.     Upon information and belief, Pullen continues to use such Confidential/Proprietary Information to further her competing SparHawk business, and communicate with Bramshill's current and potential investors for personal gain, to the detriment of Bramshill.

23.     Plaintiff has suffered significant monetary damages and loss due to Defendant's willful misconduct.  Plaintiff believes and therefore avers that unless the relief requested herein is granted by the Court, Defendant will continue this improper conduct.  Plaintiff therefore seeks preliminary and permanent injunctive relief to protect its valuable client and employee relationships, goodwill, and Confidential/Proprietary Information.

24.     Enforcement of the lawful obligations owed by Defendant to Plaintiff is appropriate and necessary to protect Plaintiff's legitimate business interests, customer and employee relationships, goodwill, and Confidential/Proprietary Information.

25.     Plaintiff will suffer irreparable harm for which it cannot be adequately compensated by monetary damages alone if the preliminary and permanent injunctive relief requested herein is not granted.

## V.    FACTUAL ALLEGATIONS

26.     Plaintiff Bramshill is a small asset management firm that was founded only seven years ago, but in such time, has developed and created significant goodwill and proprietary assets.

27.     Defendant began working for Bramshill as an Executive Director on or about May 20, 2019 and reported to Stephen Selver, Chief Executive Offer at Bramshill.

28.     In that capacity, Defendant was privy to Bramshill's most coveted proprietary documents including client lists.

29.     Defendant's job duties included, but were not limited to soliciting investors for strategies managed by Bramshill; working on sales and marketing team to produce marketing materials and overall goodwill of the firm.

30.     In or around the time that she was hired as an Executive Director, Defendant denied operating any other competing businesses or engaging in any outside activity, and reassured Bramshill's executives that she had ceased all SparHawk operations, including her SparHawk e-mail accounts.

31.     Moreover, Defendant signed an Employment Agreement at the commencement of her employment in which she acknowledged and agreed to "devote her full business time, attention, efforts, and energy to the interests and affairs of [Bramshill] and during the term of this Agreement, shall not engage in any other business activity, whether or not pursued for pecuniary advantage, that will require any substantial service on the part of [Plaintiff]."  See, **Exhibit C**, Employment Agreement.

32.     This means she was unable to lawfully continue marketing, directing, soliciting or managing business affairs except for those related to Bramshill.

33.     Throughout her employment relationship with Plaintiff, Defendant received specialized and proprietary training to succeed in her respective role, and was paid substantial wages for her work, at approximately $200,000 per year which is the highest salary available for senior sales members.

### DEFENDANT'S ACCESS TO PLAINTIFF'S CONFIDENTIAL INFORMATION/TRADE SECRETS

34.     At her time of hiring, Defendant was presented with Bramshill's Code of Ethics and Compliance Manual – both of which contained company policies and procedures, and regulatory and privacy regulations, which detailed proper company protocol for handling the aforementioned Confidential/Proprietary Information.

35.     More specifically, the Compliance Manual contains the following relevant sections concerning proprietary and confidential information and the safeguarding of such documents: Chapter 1: Overview: Confidential and proprietary information of the firm; Chapter 8: Privacy Policy, Privacy regulation and Protection of investor information; Chapter 9: Information Security Policy, Cybersecurity; Chapter 10: Electronic Communication Policy, Use of public e-mail accounts, Retaining electronic communications; and Chapter 12: Record Retention.

36.     Defendant acknowledged and agreed to abide by such provisions during her employment.

37.     Additionally, Defendant received Bramshill's Code of Ethics at the commencement of her employment which specifically detailed conflicts of interest and prohibited conduct such as outside business activities in Section II(B).  This undoubtedly included Defendant's direct involvement in a competing firm such as SparHawk.

7

38.      Additionally, Bramshill demanded that Pullen not use her personal SparHawk e-mail account, including sending and/or receiving information or documents.  Instead, and in accordance with Bramshill's policies and protocols, any and all communications and transmittal of documents should remain on her Bramshill issued e-mail account.   See **Exhibit A**.

39.      Based on Defendant's representations to comply with Bramshill's policies and procedures (not to mention applicable state and federal regulatory and privacy laws), Plaintiff gave Defendant access to the aforementioned significant Confidential/Proprietary Information – critically: client lists, marketing materials, and investment amounts by investor and trends, to name a few.   Additionally, Bramshill provided Defendant with access to its "prospect and target lists" which took enormous resources to amass and to determine who the decision-makers were at each organization.

40.      By having access to client contact data in particular, Defendant became privy to confidential, proprietary, and trade secret information including, without limitation, the client's names, addresses, contact information, dates of birth, social security numbers, investment amounts, payment schedules, and other confidential information.

41.      This Confidential/Proprietary Information is independently valuable, was acquired, created, and compiled at significant cost to Plaintiff; this information  provides insight into how Plaintiff does business, and is not available to competitors and others.

42.      While performing services for Plaintiff, Defendant utilized all of the Confidential/Proprietary Information described above in identifying Plaintiff's current and prospective clients, interfacing with them, and providing them asset management services.

43.     Indeed, Defendant could not have performed any of this work on behalf of Plaintiff without such information, and Defendant would not have learned or otherwise had access to such information but for her employment with Plaintiff.

44.     On or about July 29, 2019, Pullen signed a Quarterly Compliance Attestation in which she acknowledged that she was not engaging in any undisclosed outside business activity. See **Exhibit B**.

## DISCOVERY OF DEFENDANT'S UNLAWFUL USE OF PLAINTIFF'S PROPRIETARY DOCUMENTS AND DEFENDANT'S TERMINATION

45.     In and around August of 2019, and in connection with Bramshill's supervisory and regulatory requirements as a Registered Investment Advisor, Bramshill's outside compliance consultant, Sean Wilke of Greyline Partners, LLC informed Bramshill's Chief Compliance Officer, Bill Nieporte, and Chief Investment Officer and Founder, Art DeGaetano of Defendant's suspicious and prohibited activity of sending proprietary documents and information from her Bramshill e-mail account to her SparHawk e-mail account.

46.     Due to the highly confidential nature of Bramshill's business, Greyline Partners LLC serves as an added level of compliance to ensure that all Bramshill employees are adhering to company policy, as well as applicable federal and state regulatory and privacy laws.

47.     Mr. Wilke discovered that on August 6, 2019 at 6:02 p.m., select files and information, including Bramshill's most-coveted client list, as well as numerous other Bramshill employee client lists, were sent from Defendant's Bramshill e-mail account to her SparHawk e-mail account, without authorization or permission, and in violation of Plaintiff's business protocols.

48.     Plaintiff did not stop there.  An hour later, she sent another e-mail from her Bramshill e-mail account to her SparHawk e-mail account containing additional client list and proprietary information.

49.     Mr. Wilke, with the assistance of Bramshill, determined that Defendant wrongfully converted the following proprietary files in these two e-mails: "US Institutional Marketing List," "Richard Pound List," "Cresta Capital Lists," "Steve Josh List," John W List," and "Preqin Investors Export."

50.     Additionally, many of the e-mails that Pullen forwarded from her Bramshill e-mail account to her SparHawk e-mail account contained potential investors and leads that were provided by Bramshill's executives, Steve Selver and Art DeGaetano.

51.     Bramshill was stunned by Mr. Wilke's discovery and immediately inspected Defendant's Bramshill e-mail account to determine whether any other confidential and proprietary documents were sent in violation of Plaintiff's business protocols, and upon information and belief, with the intent to compete with Bramshill.

52.     To Bramshill's surprise, Defendant failed to abide by company protocol on more than 15 other occasions during her employment.  Most troubling, Defendant wrongfully converted multiple marketing lists downloaded from Prequin; Bermuda Pipeline investor lists; and contact list created and developed by other Bramshill executives during these prior infractions.

53.     Since the aforementioned client lists were created while Defendant was an employee of Bramshill, the content and substance of those lists belong exclusively to Bramshill.

54.     Defendant's egregious conduct started within the first few weeks of hire date, and continued throughout her employment.  Through their investigation, Greyline confirmed that Defendant violated numerous company protocols, including the Compliance Manual, more

specifically, Chapter 1: Overview – Confidential and Proprietary Information of the Firm; Chapter 8: Privacy Policy – Privacy Regulation and Protection of Investor Information; Chapter 9: Information Security Policy – Cybersecurity; Chapter 10: Electronic Communication Policy – Use of Public Email Accounts and Retaining Electronic Communications; Chapter 12: Record Retention; and Bramshill's Code of Ethics, Outside Business Activities.

55.     On August 8, 2019, Defendant was terminated from Bramshill for violating Plaintiff's business protocols, her Employment Agreement, and regulatory and privacy regulations.  Worse, Defendant's conduct severely jeopardized and potentially exposed clients' confidential information.

56.     When confronted, Defendant initially denied wrongfully converting Plaintiff's business information.  In fact, she attempted to make excuses for her actions including that the names sent to her personal e-mail were contact information she had before coming to Bramshill, or she sent the names to her personal laptop so she could "use two screens to fill in information in the CRM system."

57.     But eventually, Defendant realized that her arguments were futile and that she had in fact breached serious company protocol.  She later admitted that "[it] was a mistake that [she] made while trying to perform [her] role."  Defendant knew that she was caught and begged for her job back.

58.     During her termination meeting, Defendant was instructed to immediately return her company-issued laptop and access key card.  Despite multiple requests, Defendant has failed to return such items, or provide any assurance that she intends to return such company property.

**DISCOVERY OF DEFENDANT'S ADDITIONAL MISCONDUCT AND MISAPPROPRIATION OF PLAINTIFF'S CONFIDENTIAL INFORMATION**

59.    Following Defendant's termination, Plaintiff continued its investigation to determine the extent of Defendant's misconduct.

60.    Plaintiff took immediate steps to cut off Defendant's access to her Bramshill e-mail account and Plaintiff's files and networks.  However, the damage was already done.  Defendant had not only converted Bramshill's most-prized client lists, but also marketing strategies and materials, colleague's working client lists, and most importantly, clients' confidential contact information.

61.    Upon information and belief, Pullen continues to use Bramshill's confidential and proprietary documents to further her SparHawk business.

62.    Plaintiff's internal and outside compliance consultant continued its forensic investigation following Defendant's termination and revealed several items of very serious concern and showed the sheer magnitude of Defendant's willful misconduct.  Bramshill incurred significant monetary damages, including the payment of Greyline's invoices, to investigate Pullen's wrongdoing.

63.    Plaintiff also discovered through social media platforms that SparHawk was alive and well, despite Defendant's claims to the contrary.  It became readily apparent that Defendant had continued operating SparHawk during her employment at Bramshill, and continues operating SparHawk to this day.

64.    Despite Bramshill's request to Pullen to return confidential, proprietary, and trade secret information – which was initially made at Pullen's termination meeting and again the following week in writing – Pullen refused.  It was not until Bramshill filed a Motion for Preliminary Injunction and Temporary Restraints on or about September 24, 2019 that Pullen finally returned 1,163 pages of documents that contained confidential, proprietary, and trade secret

information that belonged to Bramshill.  Incredibly, these documents contained numerous e-mail communications from Ashley Pullen's Bramshill e-mail account to her SparHawk e-mail account.

65.     Additionally, Pullen executed an Affidavit to resolve Bramshill's Motion for Preliminary Injunction stating that she returned everything in her possession; destroyed all electronic copies and further agreed not to use such documents or information to compete with Bramshill.

66.     However, this hardly exonerates Pullen from her wrongdoing and deceitful conduct which has caused damages and will continue to cause damages to Bramshill and its business operations.

67.     Pullen simply cannot be trusted.  She affirmed not once, but twice during her employment that she ceased use of her SparHawk operations (and e-mail account), both which proved false.  To the contrary, Pullen manipulated a scheme to convert Bramshill's most coveted information and documents to her SparHawk e-mail account, to the detriment of Bramshill.  It was not until Bramshill filed a Motion for Preliminary Injunction that Pullen finally returned Bramshill's property.

68.     Based on Pullen's recent conduct, Bramshill believes, upon information and belief, that Defendant remains in possession of the wrongfully converted confidential and proprietary documents and information and continues to compete with Bramshill.

## DEFENDANT'S VIOLATION OF HER EMPLOYMENT AGREEMENT, AND BRAMSHILL'S CODE OF ETHICS AND COMPLIANCE MANUAL

69.    As with all of Plaintiff's employees, Plaintiff required Defendant to sign an Employment Agreement containing critical non-disclosure and confidentiality terms.

70.    With respect to Defendant's access to the Confidential/Proprietary Information, Paragraph 6 of Defendant's Employment Agreement, a specimen of which attached hereto as Exhibit C, states in pertinent part:

6.    **Confidentiality**.

(a)    Confidential Information. Employee acknowledges that Employer's continued operations and success in the investment advisory and investment management businesses are dependent upon certain methods, processes, systems, and know-how of Employer, which constitute secret and confidential information of Employer and which are valuable, special, and unique assets of Employer. Employee further acknowledges that Employer's continued operations and success in the investment advisory and investment management businesses are dependent upon Employer's continuing relationships with, and knowledge about, Clients and the goodwill those relationships create. As a result of her employment with Employer, Employee has been placed in a position to establish and maintain close personal contacts with the Clients and their Employees and the Employees of Employer. Employee acknowledges that Employee has access to secret and confidential information of Employer relating to the Clients and their Employees and the Employees of Employer, all of which are valuable, special and unique assets of Employer's business. The secret and confidential information described above includes, but is not limited to: (i) the names, addresses, and telephone numbers of Clients and of their Employees and representatives; (ii) the nature of the business and operations of any Client; (iii) the amount, nature, volume, and quantity of, and other information regarding, the services purchased or otherwise acquired by any Client or required by any Client; (iv) the nature of the Employee business operations and accounting procedures of Employer; (v) the methods, processes, systems, and know-how used, developed, or acquired by Employer in connection with the investment advisory and investment management businesses, including without limitation any such methods, processes, systems, and know-how invented, conceived, developed, improved, or perfected by Employee during the Term; (vi) Employer's prices, fees, or charges to Clients for its products or services and the compensation paid to Employer by a Client or otherwise received by Employer; (vii) information regarding the salaries, bonuses, or other compensation paid by Employer to its Employees; and (viii) accounting and financial information regarding the operations and financial position of Employer and the Clients. Nothing contained in this provision is to be construed as a prohibition or limitation on disclosing information to the U.S. Securities and Exchange Commission in reliance on, or in compliance with, federal securities laws, rules or regulations.

14

71.     Further, Paragraph 6(b) of Defendant's Employment Agreement also provides, in

pertinent part:

(b)     **Non-Disclosure**. Employee acknowledges that all of the secret and confidential information described in Section [6](a) is the sole and exclusive property of Employer. Employee acknowledges that such secret and confidential information is revealed to Employee in trust, based solely upon the confidential relationship existing between Employer and Employee, or was invented, conceived, developed, improved, or perfected by Employee on behalf of Employer. Employee acknowledges and agrees that all records, memoranda, notes, files, invoices, acknowledgments, proposals, and other documents or written information in the possession of Employer or Employee concerning such secret and confidential information are the sole and exclusive property of Employer and that all records, files, manuals, forms materials, and supplies furnished to Employee or used by Employee, and all data or information recorded or placed on such records, files, forms, materials, and supplies by Employee or any other person belong to Employer and shall at all times remain Employer's sole and exclusive property. Employee agrees that, upon termination of this Agreement, howsoever such termination is brought about, or upon request of Employer prior to such termination, Employee shall deliver to Employer all books, records, files, manuals, forms, materials, supplies, or other writings referred to above, and all copies of such writings. Employee agrees that he shall not make or retain any copies of such writings for her own personal use, or take the originals or copies of any such writings from the offices of Employer upon termination of this Agreement. Employee further agrees that he shall not, either during or after the Term, publish, distribute, or deliver any of such writings or records to any other person or entity, or disclose to any person or entity the contents of such records or writings or any of the secret and confidential information described in Section [6](a). except as may be required in the course of Employee's employment by Employer.

72.     By signing the Employment Agreement, Defendant consented to personal

jurisdiction and venue exclusively in the State of New Jersey with respect to any action or

proceeding brought with respect to her Employment Agreement. See, *Exhibit C*.

73.     Furthermore, by signing the Employment Agreement with Plaintiff, Defendant

acknowledged the confidential and trade secret nature of the Confidential/Proprietary Information

described above, and agreed not to misappropriate such information in any way.

74.     In addition, Bramshill's Compliance Manual contains several provisions

concerning the nature of Bramshill's sensitive, confidential and proprietary documents and clear

instructions to safeguard such information.   Defendant acknowledged receipt of Bramshill's Compliance Manual and agreed to comply with all of its provisions.

75.     Additionally, Defendant acknowledged and agreed to abide by Plaintiff's Code of Ethics, and to devote her entire time and energy to Bramshill.

76.     More specifically, the Code of Ethics states:

A.     Conflicts of Interest

It is the policy of the Firm that all Supervised Persons conduct the business affairs of the Firm in accordance with the highest principles of business ethics and in such manner that no conflict of interest, actual or potential, can be construed. All Supervised Persons should promptly report to the CCO any situation or circumstance which may give rise to a conflict of interest. The CCO will maintain an inventory of all material conflicts of interest through the use of a conflicts log.

***

L.     Outside Business Activities

Business activities other than employment at the Firm may present conflicts of interest. Such instances may include, but are not limited to: (i) serving as an officer, director, trustee or partner of any business organization; (ii) participating as a member of a limited liability company or a limited partner of a limited partnership; or (iii) serving as a Supervised Person or consultant, a teacher or lecturer, a publisher of articles or a radio or television guest. **Accordingly, each Supervised Person must disclose upon hire all outside business activities to the CCO, and prior to engaging in any new outside business activity, must seek approval from the CCO by submitting an Outside Business Activity Approval Form (Appendix C).**

Unless prior approval is granted by the CCO, the Firm generally does not permit Supervised Persons to serve as an officer, partner or employee of another company or business or as a member of the board of directors or trustees of any business organization, other than a civic or charitable organization.

77.     Most egregious, Defendant never sought permission from Bramshill to operate an outside business.   Despite these clear mandates, Defendant operated a competing business, to the detriment of Bramshill.

16

78.     Indeed, Defendant also had ample exposure to the Plaintiff's Code of Ethics and Compliance Manual and knew and appreciated its provisions well.

### PLAINTIFF'S EFFORTS TO
### OBTAIN RELIEF PRIOR TO LITIGATION

79.     Bramshill initially requested the return of its Confidential/Proprietary Information during Pullen's termination meeting on August 8, 2019.

80.     Following Defendant's termination, Plaintiff requested Defendant return any of its Confidential/Proprietary Information, explain her misconduct, and sign a severance agreement. Despite multiple requests, Defendant refuses to return any of Plaintiff's files or materials.

81.     Most concerning to Plaintiff is Defendants' failure to return physical or electronic copies of the wrongfully converted Confidential/Proprietary Information, and lack of any assurance that Defendant has deleted, destroyed, or discarded electronic copies of such Confidential/Proprietary Information.

82.     Plaintiff first demanded that Defendant return her company-issued laptop on the date of her termination – August 8, 2019.

83.     On August 15, 2019, Plaintiff again requested Defendant's return of her company-issued laptop and access key card in her termination package which was mailed to her Hoboken address, and e-mailed to her SparHawk e-mail account (which curiously remains active as Plaintiff did not get a return to sender message).

84.     Plaintiff, through its counsel, made one last ditch effort, verbally and in writing, on September 18, 19, and 20, 2019, to no avail.

85.     Plaintiff's most recent request on September 20 demanded that Defendant acknowledge and agree to turn over her personal laptop to an independent forensic expert to inspect and examine her computer databases and hard drives, cloud storage accounts, electronic files and

accounts, and other metadata, and to allow the forensic expert to conduct a complete and thorough review of the documents converted by Defendant from Bramshill.  A thorough examination would determine whether Ms. Pullen converted such proprietary documents, and used them for her personal gain prior to, and following her termination.

86.    On August 8, 2019, Defendant stated in a correspondence to Bramshill that she would never use any data for personal gain, and even offered to turn over her SparHawk e-mail and personal computer to confirm same.  Based on these representations, Plaintiff was confident that Defendant would comply with Plaintiff's requests, but Defendant did not respond.

87.    Upon information and belief, Defendant's aforementioned conduct was a part of a scheme to interfere with and disrupt Plaintiff's relationships with its existing clients and to wrongfully divert critical business opportunities away from Plaintiff and towards Defendant's competing business, SparHawk.

88.    Pullen was not authorized nor permitted to send Plaintiff's Confidential/Proprietary Information to her SparHawk e-mail account, or engaged in a competing business while employed at Bramshill.    It is clear that Pullen continues to operate SparHawk up to and following her termination from Bramshill.  In fact, on or about September 12, 2019, Pullen was awarded the Women in Asset Management award for Business Role Model of the Year and listed her company "SparHawk Advisory."  **Exhibit D.**   This further illustrates Pullen's deliberate scheme to convert proprietary documents from Bramshill to SparHawk for her own benefit.

89.    Defendant's conduct, including without limitation the unauthorized use and possession of Plaintiff's Confidential/Proprietary Information has caused Plaintiff to suffer significant damages and loss.

90.     Defendant's conduct, including without limitation the unauthorized use and possession of Plaintiff's Confidential/Proprietary Information has caused and will continue to cause Plaintiff substantial and irreparable injury, for which Plaintiff has no adequate remedy at law.

91.     Plaintiff has suffered substantial damages and loss of good will as a result of Pullen's actions.  These damages include but are not limited to Greyline's services invoices prior to, and following Pullen's termination; costs for an independent forensic expert to determine the extent of Pullen's wrongful conduct; and loss of reputation good-will from existing and prospective clients.

## DEFENDANT WRONGFULLY OBTAINED SUCH PROPRIETARY INFORMATION AND DOCUMENTS AND CONVERTED THEM TO HER COMPETING BUSINESS, SPARHAWK

92.     As demonstrated by her resume, Defendant describes herself as an "**INSTITUTIONAL MARKETER • INVESTOR RELATIONS • BUSINESS DEVELOPMENT".**  Eight years raising capital for alternative investments. Institutional marketing athlete known for combining vision, creativity and industry acumen to develop fund-specific asset raising campaigns by selectively targeting global network of +2000 investor contacts. Unique connection to high quality institutional investors with +20 references from the largest and most strategically important investment consultants, outsourced CIO's, pensions, families and HNWI's with emphasis on strong relationships in Europe, Latin America and Asia." See **Exhibit E**.

93.     Moreover, Defendant's resume describes SPARHAWK ADVISORY, LLC New York, NY as a niche player focusing on alternative investment managers under $500 million and women-owned hedge funds, with the purpose of advising on how to create infrastructure around

the marketing process and institutionalize branding efforts. Sparhawk also provides specialized knowledge regarding implementing strategic targeting, content, design and branding. See, **Exhibit E**. Based on these representations, it is clear that Bramshill and SparHawk are competing business.

94.     Bramshill is a boutique alternative investment manager. The sharing of institutional contacts from Bramshill is valuable information to any alternative investment manager who is trying to grow. SparHawk provides consulting for asset management firms regarding marketing, sales, and branding. All of the contacts which Defendant wrongfully converted in her time at Bramshill are valuable to a competing asset management firm.

95.     Additionally, Defendant competes with Bramshill concerning infrastructure works. Bramshill manages multiple separate accounts (SMA's with multiple custodians), mutual funds (40 acts with multiple custodians and administrators) and hedge funds (with 3 different prime brokers). The operations of Bramshill are unique because of the multiple products managed and the ability to execute with multiple dealers in all of those products. This was all built organically by Bramshill and is unique in the industry.

96.     Defendant was given access to Bramshill's infrastructure and continues to use this information to assist other alternative investment managers (e.g. competitors) to mimic Bramshill's setup. In the competitive world of asset management, infrastructure efficiencies and economies of scale are crucial to earnings and make the difference between a profitable firm and an unprofitable firm. Defendant continues to operate Sparhawk, and use this information in her advisory role with other alternative investment managers.

## VI.    CLAIMS AGAINST DEFENDANT

### FIRST CAUSE OF ACTION
### (Violation of Economic Espionage Act, as Amended by the Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq.*)

97.    Plaintiff repeats and realleges paragraphs 1 through 96 of this Complaint with the same full force and effect as if fully set forth herein.

98.    During and following her employment with Plaintiff, Defendant misappropriated Plaintiff's Confidential/Proprietary Information, including trade secrets related to products and services used in and intended for use in interstate commerce.

99.    Plaintiff's trade secrets include, and are not limited to: financial and operational information; proprietary business plans and strategies; trade-secrets; marketing material; servicing and related business data; client contact information; and client personal data.

100.    Defendant misappropriated these trade secrets and has received, possessed, and benefitted from them knowing that they were obtained without authorization from Plaintiff.

101.    The information that Defendant misappropriated constitutes trade secrets protected by the Economic Espionage Act, as Amended by the Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq*.

102.    Defendant's misappropriation of Plaintiff's trade secrets was willful and malicious. Plaintiff is entitled to exemplary damages in an amount up to twice-actual damages awarded.

103.    As direct consequence of Defendant's misappropriation, Plaintiff has suffered damages for actual loss in an amount to be proven at trial, including attorneys' fees and costs.

104.    As a direct consequence of Defendant's misappropriation, Plaintiff is entitled to injunctive relief, enjoining Defendant, and all those acting in concert or participation with them, from further accessing, using or disclosing Plaintiff's Confidential/Proprietary Information, from

soliciting its employees and from contacting, soliciting, or otherwise providing goods or services to any of the customers identified in the Confidential/Proprietary Information.

## SECOND CAUSE OF ACTION
### (Violation of The New Jersey Trade Secrets Act ("NJTSA"), N.J.S.A. 56:15-1, et seq.,)

105.     Plaintiff repeats and realleges paragraphs 1 through 104 of this Complaint with the same full force and effect as if fully set forth herein.

106.     During her relationship of employment with Plaintiff, Defendant had access to and knowledge of Plaintiff's sensitive and Confidential/Proprietary Information.  Plaintiff derives economic value and a competitive advantage from the fact that this information is not known to or available to its competitors who could, themselves, derive independent economic value from its disclosure or use.  Because of the value of this information, Plaintiff undertook reasonable measures to maintain its secrecy.

107.     Plaintiff's Confidential/Proprietary Information constitutes "trade secrets" as that term is defined under the NJTSA.

108.     Defendant without authorization possessed and/or asserted control over Plaintiff's Confidential/Proprietary Information and has retained that information after the termination of her relationship with Plaintiff.

109.     Defendant engages in a competing business with Plaintiff and has used Plaintiff' Confidential/Proprietary Information for her benefit.

110.     Defendant's acts and conduct constitute misappropriation of trade secrets.

111.     Defendant's misappropriation of trade secrets was willful, malicious, and in reckless disregard of the adverse consequences to Plaintiff.

112.     Plaintiff has suffered actual damages as a result of Defendant's misappropriation of Plaintiff's trade secrets. Plaintiff is entitled to damages against Defendant for her conduct.

113.    Plaintiff has suffered and will continue to suffer irreparable harm as a direct result of Defendant's misappropriation.

### THIRD CAUSE OF ACTION
### (Violation of the New Jersey Computer Related Offenses Act, N.J.S.A. 2A:38A-1, et seq.)

114.    Plaintiff repeats and realleges paragraphs 1 through 113 of this Complaint with the same full force and effect as if fully set forth herein.

115.    During her relationship or employment with Plaintiff, Defendant had access to protected computers that contain Plaintiff's Confidential/Proprietary Information.

116.    The Defendant's usage of Plaintiff's computer systems exceeded her authorized access when she accessed, collected, and wrongfully (and intentionally) converted Plaintiff's Confidential/Proprietary Information through the usage of her computer and personal e-mail accounts.

117.    Pursuant to New Jersey's Computer Related Offenses Act, N.J.S.A. 2A:38A-1, et seq., it is a violation of the statute to access any computer, computer system or computer network and knowingly alter or tamper with any data stored or maintained therein.

118.    Upon information and belief, Defendant accessed and intentionally converted documents, files and information stored on Bramshill's computer system and database.

119.    Upon information and belief, Defendant took the foregoing actions knowingly and with the intent to injure Bramshill.

120.    As a result of the actions of Defendant, Plaintiff has been damaged.

### FOURTH CAUSE OF ACTION
### (Breach of Contract/Breach of Employment Agreement)

121.    Plaintiff repeats and realleges paragraphs 1 through 120 of this Complaint with the same full force and effect as if fully set forth herein.

23

122.    Plaintiff entered into valid and enforceable Employment Agreement with Defendant as a precondition for her employment with Plaintiff.

123.    Additionally, Defendants acknowledged and agreed to abide by Plaintiff's Compliance Manual and Code of Ethics.

124.    Defendant received consideration for signing and entering into the contracts containing such non-disclosure and confidentiality provisions.

125.    In Plaintiff's Compliance Manual and Code of Ethics (and her Employment Agreement), Defendant specifically warranted and agreed that she would not disclose to any person or use for her own purposes any of Plaintiff's Confidential/Proprietary Information.  Also Defendant warranted and agreed that she would return all of Plaintiff's documents and other property, including the Confidential/Proprietary Information.

126.    Defendant has breached her Employment Agreement with Plaintiff, as well as Plaintiff's Compliance Manual and Code of Ethics. Without authorization from Plaintiff, Defendant wrongfully converted the Confidential/Proprietary Information belonging to Plaintiff and has retained and improperly used that information prior to and after the termination of her employment with Plaintiff.

127.    The information at issue is not generally known to Plaintiff's competitors through legitimate means, is the subject of reasonable protective measures.

128.    Plaintiff has suffered actual damages as a result of Defendant's breaches.  As such, Plaintiff is entitled to monetary damages and injunctive relief against Defendant.

129.    Plaintiff has suffered, and will continue to suffer, irreparable harm as a direct result of Defendant's breach of her confidentiality and non-disclosure obligations until such time as she is ordered to cease using Plaintiff's confidential, trade secret, and proprietary information.

## FIFTH CAUSE OF ACTION
### (Breach of the Duty of Loyalty/Faithless Servant)

130.    Plaintiff repeats and realleges paragraphs 1 through 129 of this Complaint with the same full force and effect as if fully set forth herein.

131.    As Plaintiff's employee, Defendant owed Plaintiff a duty of loyalty.

132.    Defendant violated this duty of loyalty by a variety of actions including, without limitation: (1) performing unauthorized competing independent asset management services for her own benefit, and using the Plaintiff's Confidential/Proprietary Information in furtherance of that scheme; (2) wrongfully converting and possessing physical copies of Plaintiff's critical business files, work emails, and other data; and (3) downloading and possessing Confidential/Proprietary Information belonging to Plaintiff while still was employed by Plaintiff, retaining that information after the termination of her employment relationship with Plaintiff, and using Plaintiff's Confidential/Proprietary Information to compete with Plaintiff during and after her employment relationship with Plaintiff.

133.    As a consequence of Defendant's actions, Plaintiff's professional reputation and business relationships with its existing and potential customers and business partners has been irrevocably harmed.  In addition, the actions of Defendant has caused Plaintiff economic harm in the form of lost profits Plaintiff would have otherwise received, damages for usage of its Confidential/Proprietary Information, and losses and damages for the time and expenses required to remedy the damage done to Plaintiff's business operations.

134.    Plaintiff is entitled to monetary damages against Defendant in an amount to be determined at trial.

25

## SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

135.    Plaintiff repeats and realleges paragraphs 1 through 134 of this Complaint with the same full force and effect as if fully set forth herein.

136.    Defendant has profited from the aforementioned acts committed against Plaintiff and therefore, Defendant has been unjustly enriched at Plaintiff's expenses.

137.    It would be unjust to allow Defendant to retain the benefit of profiting at the expense of Plaintiff as a result of the foregoing.

138.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests relief as follows:

A.    For preliminary and permanent injunctive relief against Defendant including the return of Plaintiff's Confidential/Proprietary Information which was wrongfully converted for her own personal and professional use;

B.    For an order permitting immediate and expedited discovery to allow Plaintiff to ascertain the full extent of Defendant's improper conduct and the extent of damages she has caused Plaintiff to suffer;

C.    For an order requiring Defendant to immediately return to Plaintiff all copies and originals of Plaintiff's Confidential/Proprietary Information;

D.    For entry of judgment in favor of Plaintiff and against Defendant;

E.    For an award of monetary damages, costs, the fees and costs associated with Plaintiff's forensic review of its computers and server, and attorneys' fees;

F.    For such other and further relief as the Court deems just and proper.

Dated: February 4, 2020
Florham Park, New Jersey

                                        Respectfully submitted,

                                        /s/ *Elizabeth Lorell*
                                        Elizabeth F. Lorell
                                        Matthew P. Gallo

                                        Gordon & Rees, LLP
                                        18 Columbia Turnpike, Suite 220
                                        Florham Park, NJ 07963
                                        Tel: 973-549-2500
                                        Fax: 973-377-1911
                                        Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

BRAMSHILL INVESTMENTS, LLC )
)
          **Plaintiff,** )
)
v. )
)    **VERIFICATION**
ASHLEY PULLEN, )
)
          **Defendant.** )

STATE OF NEW JERSEY )
) ss.:
COUNTY OF BERGEN )

    Kevin Jester, being duly sworn, deposes and says:

    I am Chief Operating Officer for Bramshill Investments, LLC ("Bramshill"), plaintiff in the above captioned matter. I have read the foregoing Verified Complaint and know the contents thereof and state that the allegations are true. I base this verification on my own knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true. The grounds of my knowledge, information and belief are derived from my position as Bramshill's COO, my personal involvement in the events underlying this litigation, and general investigation of the facts and circumstances described in the Verified Complaint, including, without limitation, my review of Bramshill's records, and conversations with Bramshill's employees.

                                                    KEVIN JESTER